---

## *In re* WEIL.

(*Supreme Court, General Term, First Department.* May 18, 1888.)

WILLS—CAPACITY TO MAKE—QUESTION FOR JURY.

A testatrix bequeathed to her brother, who was her only relative in this country, five dollars in cash, assigning in her will as a reason that he had never visited her during her sickness. The balance of her estate, about $5,000, she left to an acquaintance. When making her will she declared to her lawyer that her brother had never visited her. She was at that time very sick and weak in mind, and seemed to be forgetful. There was evidence that for several years she had acted as though demented. Her brother had visited her several times during her sickness. *Held,*

that the decree admitting the will to probate should be reversed, and the question whether she was laboring under a delusion or loss of memory so as to deprive her of testamentary capacity should be submitted to the jury.

Appeal from surrogate's court.

Appeal from the decree of the surrogate admitting to probate the last will and testament of Emilie Weil. Meyer Oppenheimer and Baer Oppenheimer, contestants.

Argued before VAN BRUNT, P. J., and BRADY and BARTLETT, JJ.

*Benno Loewy*, for appellants. *Alfred Steckler*, for respondents.

BARTLETT, J. Upon all the evidence in this case I think it is very doubtful, indeed, whether the decedent possessed testamentary capacity at the time of the execution of the instrument which has been admitted to probate as her will. At the date of her death, on June 20, 1885, Mrs. Emilie Weil, the testatrix, was a widow upwards of 66 years of age. Her husband had been dead about five years, and there never had been any children of the marriage. Her only next of kin were two brothers, Meyer Oppenheimer, who is the contestant in this proceeding, and who lives in the city of New York, and Baer Oppenheimer, residing in the city of Hamburg, Germany. By her will, which was executed in due form of law on April 12, 1885, she gave nearly all her property, consisting wholly of personal estate, and amounting in value to about $5,000, to Mrs. Hannah Hoffman, an acquaintance, who appears to have shown some kindness to the decedent while she was ill. She made no mention in the will of any of her relatives except in the second article, which is in these words: "To my brother, Meyer Oppenheimer, who has never visited me during my sickness, I give and bequeath the sum of five dollars in cash."

I agree with the learned surrogate that Mrs. Weil's determination to make a will sprang from a disposition to deprive her relatives of her property rather than from any desire to benefit those to whom she bequeathed it. According to the contestant, however, her action in this respect was due to a delusion in reference to his conduct. It was not true in fact, as she stated in the will and stated orally prior to its execution, that her brother Meyer Oppenheimer had never visited her during her sickness. The surrogate says that it is impossible to ascertain from the testimony the number of his visits, but there may have been as many as five or six in the five or six months next preceding the execution of the will. The proof leaves no doubt in my mind that the cause which induced the decedent to leave only a nominal sum to this brother was a belief that he had neglected her during her illness to such an extent as never to visit her at all. That this supposition was erroneous is clearly established by the evidence, and so found by the surrogate; and the appellant contends that her mistake in this respect was a delusion so affecting her capacity as to render void the testamentary disposition which she attempted to make. In support of this view he relies upon other testimony in the case tending to show irrational and erratic conduct on the part of the decedent at various times prior to the execution of the will. The first person to whom Mrs. Weil spoke about making a will appears to have been Mr. Joseph Waldeck, whom she eventually selected as her executor. She proposed to leave all her property to him, saying she had no better friend in the world, but he, with an unselfishness rarely disclosed in will cases, declined to permit her to do so, suggesting that he would not like to have people attribute her action to undue influence on his part. He asked her whether she had any relations here. She answered that she had a brother here, but she did not care about him because he did not come to look after her, and he should have nothing; he should not have anything because he did not come near her. Mr. Waldeck told her she had better give this brother something, anyway, and she said she would give him five dollars. The decedent also rejected a suggestion from Mr. Waldeck that she should make a bequest to some institution.

The remainder of the conversation, which occurred shortly before the execution of the will, is related by Mr. Waldeck as follows: "Then I asked her: 'Have you got nobody who was kind to you while you were sick?' 'Yes,' she had. There was a butcher woman across the street who was very kind to her, and sent her soup every day, and was very friendly and kind to her. Then I said, 'Give it to the butcher woman.' 'Well, all right,' she says, and so it was done." The will was drawn by Mr. Louis Ansbacher, an attorney who was sent to Mrs. Weil by Mr. Waldeck. The memorandum of her directions to Mr. Ansbacher, which he made in her presence at the time they were given, was put in evidence before the surrogate, and contains these words with reference to the contestant: "My brother, Meyer Oppenheimer, of this city, five dollars. Never called during my sickness." Mr. Ansbacher also testified that the decedent told him that she had relatives, a brother here in the city; but she had been sick two years, and this brother had never been near her. She was going to give him five dollars, and that was all. About her other relatives in Germany, she did not want to know anything about them; but Mrs. Hoffman, the butcher woman who lived across the street, had attended her during her sickness, and provided her with food and delicacies. Every day she had nice meat, stewed apples, and all that sort of stuff, and this woman she was going to leave her everything, excepting the other small bequests. Louis Frank, who was one of the witnesses to the will, (Mr. Ansbacher being the other,) states that when Mr. Waldeck asked the decedent whether she had no relations, she responded: "My relatives they never come to see me in my life, and they cannot see me when I have died." According to the same witness she also said she had a brother here who would get but five dollars, because he did not come to see her during her sickness. Mrs. Weil spoke the English language very imperfectly, and the conversation with Messrs. Waldeck, Ansbacher, and Frank was carried on in German. After the will was prepared Mr. Ansbacher translated the contents to her from English into German, sentence by sentence. The decedent expressed her assent as he proceeded, and after the reading was completed she subscribed the instrument with the formalities required by law.

In the opinion of the surrogate, the declaration of the testatrix that her brother never visited her while she was ill is to be regarded merely as the language of exaggeration rather than as evidence of the existence of a delusion on her part. He deems this view more reasonable "than to suppose that she had altogether forgotten the visits of her brother, or was under such a delusion regarding him that she did not know that those visits had never taken place." But I find it difficult to draw from the evidence so satisfactory a conclusion as to the decedent's testamentary capacity. There is no suggestion by any of the witnesses that they may have misapprehended the language which she used with reference to her brother. They all understood from her that he had never visited her during her sickness, precisely as the will declares. As we have already seen, this assertion was contrary to the truth. While the utterances of displeasure and indignation are often extravagant and exaggerated, it seems unlikely that this woman, whatever she might have said in giving directions to the draughtsman of her will, would have permitted a statement, which she knew was untrue, to be inserted in the instrument itself. To my mind it is much more probable that she had forgotten her brother's visits, or did not know that he had been to see her. In the first case, her memory must have been seriously impaired; in the second, she must have been laboring under a delusion as to his conduct. In consequence of this lack of memory, or this delusion, if it existed, she sought an object of her bounty in a comparative stranger who dwelt in the neighborhood where she lived, and of whom she knew so little that when first speaking of this person to Mr. Waldeck she described her as the butcher woman across the street.

That the decedent was very ill at the time of the execution of the will is un-

disputed, and the surrogate has expressly found that she was then a woman without much mental activity or strength of purpose. Mrs. Henrietta Jackson, who lived in the same house, testified that sometimes she would call upon Mrs. Weil in the morning, and if she came in 10 minutes later Mrs. Weil would not remember.that she had been there before; and Rosa Strauss, the nurse, who receives a legacy of $50 under the will, says "she was very sick, sometimes when she was, she did not know what she was speaking." While this evidence, if it stood alone in the case, might not be very important, it becomes quite material as tending to show that the decedent was not of sound memory when viewed in connection with her erroneous declarations concerning the visits of her brother. The probability that she was the victim of a delusion on this subject is also strengthened by the proof of prior eccentricities of conduct on the part of Mrs. Weil. The surrogate says that this testimony does not throw much doubt upon her competency, but I think it throws just enough to make it more likely than not that she acted under the influence of a delusion in disheriting her brother. Mrs. Oppenheimer, the wife of the contestant, describes some strange behavior on the part of Mrs. Weil, three years before her death, on the occasion of a visit to her brother's house. "She went round the room," says the witness, "and knocked the chairs, and I said, ' What is the matter?' She said she was going to jump in the water. I said, ' What is the matter? You eat and sleep. What is the matter with you?' 'I do not know what is the matter,' she said." A Mrs. Leon, with whom the decedent boarded, apparently at about the same period, testifies that Mrs. Weil used to walk about the house with a lamp in her hand in the middle of the night, and frighten the witness by coming into her bedroom after she had gone to sleep. This would occur at 1 or 2 o'clock in the morning. Similar testimony was given by another witness, at whose house Mrs. Weil was subsequently a boarder. She says Mrs. Weil "was out of her senses most of the time. All night long Mrs. Weil was going around with a lamp in her hand, and through that account I had to make her go out of my house." This witness heard her begging on one occasion from a butcher, saying she had no money to buy meat. She also saw Mrs. Weil throw out of the window various articles which were the property of the witness; once a silk umbrella, and at another time, a skirt, waist, and apron, which she wrapped up in a bundle.

It is not necessary further to review the evidence on this branch of the case, but I think it serves to show that the mental constitution of the decedent was such as to render her not unlikely to fall under the influence of a delusion affecting her relations to others. In the case of *Society* v. *Hopper*, 33 N. Y. 619, 625, it was said by DENIO, C. J., that if the deceased was unconsciously laboring under a delusion in respect to his wife and his family connections, who would naturally have been the objects of his testamentary bounty, when he executed the will, and the court can see that its dispository provisions were or might have been caused or affected by the delusion, the instrument is not his will, and cannot be supported as such. To the same effect is the decision of this general term in *Re McCue*, 17 Wkly. Dig. 501. Except the declarations of Mrs. Weil herself as to his neglect to visit her, I find nothing in the evidence to indicate that the conduct of the brother was otherwise than friendly to the decedent; and it seems to me that the testamentary disposition under consideration in the present case not only might have been but very probably was affected by the decedent's delusion or absolute loss of memory in regard to her brother's visits. I think, therefore, that the decree of the surrogate should be reversed, and that an order should be made directing a trial by jury of the question whether at the time she executed the paper, which has been propounded as her will, the decedent was laboring under such a delusion or loss of memory as to deprive her of testamentary capacity.