*(Surrogate's Court, Albany County.* December 19, 1889.)

WILLS—CAPACITY TO MAKE—DELUSIONS.

Decedent executed an instrument intended as his will, giving all his property to charities, except a sum to his executor "large enough to be over and above any bribe" by his relatives. The subscribing witnesses were comparative strangers to him. He had some years before been an inmate of an insane asylum, and for a long time prior to his death believed his brothers and sisters were trying to poison him;

that devils were pursuing him; and by many strange actions he appeared to be laboring under a delusion concerning his relatives which influenced him in making the will. *Held,* that the paper must be rejected as unnatural, unreasonable, and strange on its face, and cannot be upheld as the will of decedent, though the subscribing witnesses believed him to be of sound mind when he executed it.

On application for probate of will of Seley Lockwood.

*Stedman, Thompson & Andrews* and *The Attorney General,* for proponent. *Emory A. Chase* and *Nathaniel C. Moak,* for contestants.

WOODS, S.    Seley Lockwood died at South Westerlo on the 20th of October, 1888, aged 72 years.   On the 16th of February, 1880, he executed the proposed will, with the formalities required by law, in the presence of two witnesses, who had seen him only a few times, and knew very little of him, or of his antecedents.   His estate consisted of personal property only, deposited in savings banks, and which had been so kept for many years.   A considerable portion of it was in the National Savings Bank at Albany, and the other books of his bank deposits were left thereat by him for safe-keeping. Mr. Stephens, the executor named in the proposed will, is the secretary of that bank.   In this will, Mr. Lockwood bequeathed one-half of his property to the State Lunatic Asylum at Utica, and the other half to the Orphan Asylum at Albany; and he inserted therein a provision to this effect: "I give and bequeath to my executor, Albert P. Stephens, of Albany city, a sum from my estate up as high as one-quarter, large enough to be over and above any bribe that may be offered by my brothers, sisters, and children for the redemption of this will, and their heirship to my estate."   This will is a holograph, entirely in decedent's handwriting; but, as he had executed another will, in presence of one of the subscribing witnesses to this one, but a short time before, and had had one drawn about that time by a Mr. Robbins, the contents of which do not appear, it may have been copied therefrom.

Decedent had resided most of his life in the neighborhood where he died. He once went south, but to what point does not appear.   At another time he went west, near Kansas City, and at another time, from January 10 until October 9, 1849, when about 33 years of age, he was an inmate of the insane asylum at Utica; having been taken there by his brother George and by one Henry Myers, who is now dead.   On the 9th of October, 1849, he left the asylum, in company with his brother, "improved."   It does not appear that he ever entirely recovered, and I think it quite evident that he never did.   He inherited about seven or eight thousand dollars from his father and a sister, and at the time of his death he had over twenty-three thousand dollars on deposit in the savings banks.   He was a very close, penurious man.   He made sharp bargains; wore poor clothing, which he made himself; and it is said that he usually wore about three suits of clothes at one time.   He boarded about among his relatives, paying 20 shillings a week for his keeping; for which he always took receipts, which he himself made out.   It appears that his brothers and sisters joined with him in deeds of land which they inherited with him, he receiving the agreed consideration, and the money which he inherited was paid directly to him.   It does not appear to have been claimed that he was deranged as to his mere pecuniary transactions.   He was evidently quite sane, methodical, and sensible upon such matters.   But I do not see how such transactions reflect upon his peculiarities and delusions upon entirely different subjects.   His usual business transactions, as shown upon the trial, were brief, simple, and all of a similar character,—inquiries as to deposit of money, deposits thereof, occasionally changing the deposits and receipts of interest.   It appears that he invested some money in a savings bank at Kansas City which failed; and, after his return home, Mr. Stephens, of the National Savings Bank, collected one or more dividends for him from the receiver of the broken bank.

The peculiarities and delusions of the decedent were numerous and striking. He took borax "to weld up his inwards." He refused to take food until others had taken of it, for fear it had been poisoned, and would kill him. He asserted that chloroform angels had saturated his bedclothing to kill him; that his relatives and Indians were endeavoring to shoot him. He usually put a quantity of salt into his tea, to destroy the poison which he claimed had been put therein to kill him. He made ginger tea; and, if bubbles arose in the boiling of it, he threw it away, because he said the bubbles showed it was poisoned. That he had been accustomed to drink milk, and suddenly refused to use any more, stating that that offered to him had been poisoned, and that milk was an article which could be easily poisoned. He said that his relatives, with whom he was boarding, intended killing him with an axe-helve which was being polished, and also with a horse-file. Though the plates from which he ate were clean, he usually blew upon them, to throw off the poison which he supposed had been placed thereon for him to take. He refused to drink tea which he did not see poured out, though the tea had been prepared by his own sister. He busied himself for hours—sometimes for half a day at a time—under the floor of his house, sticking an old bayonet into the earth; killing "devils," as he said. He claimed that a drain from the house had been dug for a grave for him, and that his relatives intended to kill him, and to bury him in it. For half a day at a time he dug holes about two feet deep in the earth, around the house, pouring water therein, to drown out the devils; and when the existence of the devils was questioned by the hired man of his father, he flew into a rage, and threatened to kill him. He usually carried a pistol, for the purpose of protecting himself from his enemies. He frequently declared that his relatives were banded together to kill him, and thus obtain his property; and that this was revealed to him by the birds, at night. He asserted that while in the south he built a house without windows or doors,— sliding a board back to get in, and then replacing it; that he built it thus so that the "gang" could not get in. He said that he invented the first steamboat and the first engine that was ever built. He would sit in a rocking-chair and rock violently, alternately laughing and crying, with his hands spread over his face, peeking through his fingers. He said he saw a man coming out of the cellar of his brother Amiel's house, when he was stopping there, to kill him for his money; and that his brother's wife was the worst of them. He frequently cleaned out the wash-dish after it had been cleansed, claiming that it had been poisoned. There were numerous other acts and things of a similar character, but those hereinbefore enumerated are sufficient to show decedent's condition of mind.

Though displaying the usual intelligence of people of his condition in life relative to business transactions, I am satisfied that at the time of going through the formalities of executing this will, and for many years previous, decedent was laboring under the insane delusion that his relatives and next of kin, who would inherit his property if he died intestate, were his enemies, and were combined to kill him, in order to obtain his property.

I am persuaded that the alleged will must be rejected, in that it is unnatural and unreasonable and strange upon its face. The provision for preventing the bribing of the executor,—a gentleman of the very highest character; the disinheriting of every relative, and the giving of his estate to charities, (with one of which he is not shown to have any knowledge,)—might not *per se* be sufficient to justify me in declaring the will invalid, but, coupled with his delusions and his condition of mind, require such a determination. Though the subscribing witnesses give their opinion that he was of sound mind when he executed the will, the transaction of execution was very brief. They knew him but slightly, and their testimony must be weighed in connection with the light thrown upon his mental condition and delusion by all the evidence in the case. If a will be made and executed under such a delusion which

operated upon the decedent, and induced him to make it, it cannot be up-
held, though the testator's general capacity be unimpeached.    Schouler,
Wills, §§ 159, 161; *Morse* v. *Scott,* 4 Dem. Sur. 507; *In re Dorman,* 5 Dem.
Sur. 112.    If it be evident that the disposing provisions in the will were
the result of, and were caused by, such a delusion, the instrument cannot be
supported as such.    *In re McCue's Will,* 17 Wkly. Dig. 502; *Society* v.
*Hopper,* 33 N. Y. 624, 625; *Clapp* v. *Fullerton,* 34 N. Y. 190; *Keeler's Will,*
12 N. Y. St. Rep. 155–157; *In re Weil,* 1 N. Y. Supp. 91.    The rule is so
well settled that it would hardly be proper or allowable to extract from these
cases at length to prove it.    It is true that the *Case of Keeler's Will* was re-
versed, (3 N. Y. Supp. 629,) but it was on the ground that the testator's be-
lief in spiritualism was not sufficient to invalidate his will; that his declara-
tions of hostility to his relatives were merely declarations of aversion and dis-
like; and that in bequeathing all his property to his wife he was doing a just
act, as against those who had no just claim upon his bounty.    The court,
however, (page 633,) recognizes the correctness of the rule that if the testa-
tor was in fact influenced in making his will by an insane delusion as to his
relatives the will would have been invalid.    This case is quite unlike that of
*Vedder's Will,* 6 Dem. Sur. 92, decided by me in 1888.    In that case I held
that "there is no evidence whatever to show that any or all of these beliefs,
delusions, eccentricities, or peculiarities had the slightest connection with or
influence upon her testamentary act here in question;" and further, "that
mental capacity is to be measured by its relations to the testamentary act;"
and "that a person having any insane delusion relating to the property, the
persons concerned, or the provisions of the will, is incapable, while delusions
which in no way relate to these do not, as a matter of law, incapacitate."    It
will thus be seen that I was careful in that case to lay down precisely the rule
which I have applied in this.    The probate of the alleged will must be re-
fused.