1. WILLS—TESTAMENTARY CAPACITY—PRESUMPTIONS.
    There is no presumption of sanity where testator was adjudged a lunatic a month before the alleged will was executed, but burden is on proponents to show that reason had returned, or that the will was executed during a lucid interval.

2. SAME—SUFFICIENCY OF EVIDENCE.
    An insane delusion, inducing the execution of a will, made a month after testator had been adjudged a lunatic, and taking from the family of a deceased son $4,000 of the $5,700 testator had given them by a previous will, is shown by evidence that about 18 months after the previous will was made, and 3 years before testator was found insane, he conceived the idea, without any cause, that he had been poisoned by his daughter-in-law and children, with whom he had been living, and that he could not be dissuaded.

Proceedings to probate the will of Joseph Lapham, deceased, in which Seth W. Hart and others filed answers to the petition.　Probate denied.

Matteson & De Angelis, for proponent.

Smith M. Lindsley, for contestant Sarah M. Lapham.

John G. Gibson, special guardian, for Laura Lapham and Albert Lapham.

CALDER, S.　Joseph Lapham, the testator herein, died in the town of Marshall, Oneida county, on the 14th day of March, 1893. His wife died in 1886.　At that time they had two children, Nathaniel and Jerome.　Nathaniel had one son, Frank.　Jerome married Sarah M. Lapham about the year 1871.　They had two children, Laura and Albert.　At the time of the death of his wife, Joseph Lapham was the owner of three farms and a swamp lot,—the homestead farm containing about 90 acres, the Bassett or Brennan farm about 84 acres, the Shields or Wade farm about 79 acres, and the swamp lot about three acres,—all of which were situated in the town of Marshall, Oneida county.　Jerome and family lived on the Brennan farm from 1871 to 1880, when they moved to Paris Hill Green, where they lived until the death of testator's wife, in 1886, after which they resided with the testator on a small piece of property which had been owned by said wife of Joseph Lapham.　On the 13th day of August, 1886, Joseph Lapham made and executed a will by which he gave to his son Jerome Lapham, for and during his natural life, and at his death to his heirs absolutely, the Brennan and Wade farms and swamp lot. To his son Nathaniel he gave, during his life, the homestead farm, and also the use of 46 shares of stock of the Utica, Chenango & Susquehanna Valley Railroad, each share being of the par value of $100, a certain mortgage made by William Corbit of the sum of $600, a part of which had been paid, and at his death all of said property should vest absolutely in his heirs.　The balance of his personal property was equally divided between his two sons.　He appointed Seth W. Hart his executor, and authorized him to sell and convey the real estate of which Nathaniel had the life use.　The testator and Jerome and family lived together until about January, 1889, when the testator went to Michigan to reside with his son Nathaniel.　In January, 1890, he returned and continued his residence with Jerome.　On the 18th day of March, 1890, Jerome died, and 14 days thereafter the testator herein executed a codicil to his will of 1886, reciting therein that he had conveyed and transferred to his son Nathaniel the property given to him by said will, and gave and devised to his daughter-in-law, Sarah M. Lapham, the same interest in the real estate that he had before devised to Jerome; provided, however, that she remained his widow.　All other personal property was given to her two children, revoking all provisions in said will which bequeathed to Nathaniel one-half of the remaining personal property.　The value of the property given to Nathaniel was about $10,650.　The testator, Sarah M. Lapham, and the two children continued to live together until about the 1st day of October, 1890, when Sarah Lapham took up her resi-

dence elsewhere. The two children, however, remained with their grandfather until some time in the fall of 1891. On the 20th day of November, 1891, a petition in proceedings de lunatico inquirendo was verified by Sarah M. Lapham. On November 25th the testator went to the residence of John Brennan to live, said Brennan occupying the Bassett or Brennan farm. On the 9th day of December the inquisition before the commissioner and a jury began and continued until the 11th. The decedent herein was declared to be a lunatic without lucid intervals. Shortly thereafter Nathaniel Lapham and Sarah M. Lapham verified a petition or request to the Oneida county court that the findings of the jury be confirmed, and that Seth Smith, of the town of Paris, Oneida county, be appointed committee. On the 28th day of May, 1892, the findings of the jury were confirmed; and on the 1st day of September, in said year, Seth W. Hart, of the town of Kirkland, Oneida county, was appointed committee of the person and estate of said Joseph Lapham. On the 29th day of January, 1892, the testator, being in his eighty-ninth year, signed the will here offered for probate, in which Nathaniel Lapham is named as executor; which will devised to Frank Lapham, the son of Nathaniel Lapham, the Brennan farm and swamp lot, and to Laura and Albert the Wade or Shields farm. The Brennan farm, as above stated, consisted of about 84 acres, and contained the farm buildings; the Wade farm consisted of about 79 acres, and contained no buildings. The value of the devise to Frank was in the neighborhood of $4,000; to Laura and Albert, about $1,600. At this time Frank was 23, Laura 17, and Albert 8, years of age.

Proceedings were instituted for the probate of the will of 1886, and the codicil thereto of 1890, by the executor named therein. Subsequently the executor named in the will of January 29, 1892, filed a petition, asking that the same be admitted to probate. It was decided to take testimony in reference to the last-mentioned will, and answers to the petition therein were duly made by Seth W. Hart, the executor named in the former will and codicil, and by Sarah M. Lapham, a legatee therein, the special guardian of said Laura and Albert also contesting; which answers, among other things, alleged that said will was not the free, unconstrained, or voluntary act of the testator; that he was not of sound mind, memory, or understanding when it purported to have been executed; that the same was not subscribed, published, and attested as provided by statute; and that at the time of the alleged execution the testator had been judicially declared by a jury and a court of competent jurisdiction to be a lunatic, incapable of managing his affairs or taking care of his person or property, and that a committee of his person and property had been duly appointed by the Oneida county court; which committee, duly qualified, was acting as such at the time of the alleged execution of said will, which answers were afterwards amended so as to include allegations of undue influence, but the conclusions herein reached render it unnecessary to consider that question in the controversy.

The burden of proof as to testamentary capacity is upon the proponent; but the legal presumption is that every man is sane, and he who seeks to show testamentary incapacity must do so by such evi-

dence as will overcome the legal presumption of compos mentis.   The
reason is that sanity is the usual condition of mind, while insanity is
the abnormal one.   In Re Lyddy, 5 N. Y. Supp. 636, the general term
held:

"It is true that the burden of proof in all cases rests upon the proponent of a
will to prove that the testator was at the time of making the document pro-
pounded as his will of sound and disposing mind and memory.   But it is also
equally true that at common law and under our statutes the legal presumption is
that every man is compos, and that the burden of proof that he is non compos
mentis rests upon the party who alleges that an unnatural condition of mind ex-
isted in the testator."

In Re Flansburgh's Will, 82 Hun, 49, 31 N. Y. Supp. 177, it was
held:

"Although the legal presumption is that every man is compos mentis, and the
burden of proof that he is not rests upon the party alleging it, still it devolved
upon the proponents to prove not only the execution and publication of this
will, but also the mental capacity of the testator, and if, upon consideration of
the evidence on both sides, the court properly was not satisfied that the testator
was of sound and disposing mind and memory, the probate should have been
denied."

That is the rule in substance laid down in numerous cases un-
necessary here to refer to.   In the present case, however, a different
condition presents itself.   The presumption that the testator was
sane cannot here be applied.   He had been declared a lunatic a
month before the execution of the will, although the findings in
said inquisition were not confirmed until some months after.   The
legal presumption is that his insanity continued, and the burden
of proof is upon the proponents to show that reason had reasserted
itself, or that the execution of the will in question took place dur-
ing a lucid interval.   Insanity, when once shown, is presumed to
continue.   In Carter v. Beckwith, 128 N. Y. 312, 316, 28 N. E. 582:
"The presumption of its continuance [lunacy] is conclusive as to
all dealings after the inquisition until it has been superseded."   Not-
withstanding the finding of the jury that a person is insane, he
nevertheless may make a will upon proper legal evidence that he
has testamentary capacity.   As to other acts of a legally declared
lunatic a different rule is invoked.   After a final determination as
to his insanity, he is unable to enter into any contract, and the ex-
ecution of any contract which he has endeavored to make is abso-
lutely invalid.   Wadsworth v. Sharpsteen, 8 N. Y. 388;   Hughes
v. Jones, 116 N. Y. 67, 22 N. E. 446;   Carter v. Beckwith, 128 N.
Y. 312, 28 N. E. 582; L'Amoureux v. Grosby, 2 Paige, 422.   Where
a contract is made by a lunatic before an inquisition, but within
the period covered by the findings of the jury, said contract is not
absolutely void, the findings of the jury being only presumptive evi-
dence of insanity.   Hughes v. Jones, supra;   Van Deusen v. Sweet,
51 N. Y. 378.

Has the proponent complied with the rule as to testamentary
capacity above laid down and applicable to the present case?   After
a careful examination of the entire evidence and the law applicable
to the facts found, the conclusion is irresistibly reached that he has
not.   The many cases referred to in the able brief of the learned

counsel for the proponent contain the law governing the adjudication of the particular questions raised in those cases. In cases of this character, however, no precise rule can be laid down to determine what degree of mental capacity is required. What may be the law as to facts in one case cannot be construed as controlling in reference to facts produced in another. Each case must be decided upon its own facts and the law applicable thereto.

In the fall of 1888 decedent conceived the idea that he had been poisoned. It was the subject which seemed uppermost in his thoughts. He repeatedly referred to it before his going West and after his return. He insisted that the poison affected him in the same manner as it did his pigs which had taken rat poison. His physician told him that he had cholera morbus, but he alleged, however, that the poison had affected him ever since; that his limbs and head troubled him; that he broke out in large red blotches as did the pigs; that he did not feel well since he took poison; that his limbs pained him below the knee, and that they were drawing up, withering, and shrinking, and that there was a roaring in his head since the poison; that he was confused; that his joints were doubling up, all of which he repeated on numerous occasions to different witnesses; that he never would state to anybody who had tried to poison him, but that a guilty conscience would trouble them as long as they lived; that Sarah Lapham had put the poison in his coffee, and had tried to poison him, and that Laura, her daughter and his grandchild, was under her influence, and he was afraid of her; that he would not be safe with his grandchild Laura; that she had stolen money from him; that for a long time before Sarah Lapham went away he dare not eat anything that she cooked for fear there would be some poison in it; that he had been boarding himself and living on cookies; and that upon numerous occasions when talking of the poisoning he declared that his daughter-in-law had poisoned him.

He was described quite fully by witnesses who were present at the inquisition and before the inquisition, and the commissioner in part detailed what took place before him. The evidence as transcribed by the commissioner, however, has not been considered in arriving at the conclusions here expressed. The pupil of his right eye was enlarged; tongue protruded feebly; his lower jaw hung down; mouth open, and he had a wild expression in his eyes. When talking of the poisoning and in connection with his daughter-in-law and granddaughter, there was a marked change in his countenance and action. He was often pale, and shrunken in countenance, hesitating in speech, being confused as to the time of certain occurrences or transactions in his family. He said he changed his shirt twice a year, and his bed sheets by shifting them in the spring and fall. To many persons he would begin his conversation, "I have been poisoned; I suppose you have heard of it,"—and then repeat the accusations against his daughter-in-law and grandchild. He would walk about the house and yard exclaiming: "Yes, they have done it! They tried to do it, and they meant to do it!" He would converse upon some other subjects intelligently, although unable

to take part in ordinary business transactions. The proponent produced a number of witnesses in addition to the subscribing ones, three of whom were expert physicians, as to the sanity of the decedent; but their evidence, taken in connection with the whole evidence in the case, falls far short of maintaining the position of the proponent. It must be held that the decedent possessed delusions as to being poisoned and robbed, the results of the poison, and the alleged perpetrators of the acts of poisoning and robbery.

It is conceded that a person may have a delusion, and still be competent to make a valid will; but the theory in such a case is that the delusion did not enter into the testamentary act. It is where the will is governed by or is the offspring of an insane delusion that the courts have invariably held that such a testamentary disposition is invalid. Such a conclusion must be applied to this case. The proponent herein insists that the decedent had no delusions which entered into the execution of the will, and that his acts and sayings in reference to himself and as to others were mistaken beliefs. Numerous cases were cited, and there can be no dispute as to the legal conclusions drawn in those particular cases. There was no evidence that the testator had been poisoned or that he acted in the manner as described by him, or that the effect of the poison was as he claimed. He was ill, as the doctor stated. Any other condition was the result of his perverted imagination. There was nothing from which he could draw the conclusions that his daughter-in-law had poisoned him, that Laura, his grandchild, had robbed him, or that his grandson Albert had committed some act which justified his being sent from home. He spread widecast his accusations, and could not be reasoned with. Where a person tenaciously holds to the belief that a certain state of affairs exist, which in fact does not, and which can only be accounted for as the creation of a perverted imagination, without probable cause or evidence, he is suffering from a delusion, and not a mistaken belief.

From the entire evidence in the case, the delusions of the decedent could not be confounded with unreasonable prejudice or mistaken beliefs. The persons who were the subjects of his accusations at the beginning and for a long time after treated him kindly, and were attentive to his wants. No other conclusion as to the relation of these parties can be drawn from the evidence. "If a person persistently believes supposed facts, which have no real existence, except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion, and 'delusion' in that sense is insanity. Such a person is essentially mad or insane on those subjects, though on other subjects he may reason, act, and speak like a sensible man." Society v. Hopper, 33 N. Y. 624. The true test of insanity, other than absolute loss of intellect or dementia, is mental delusion. In Re Gannon's Will, 2 Misc. Rep. 330, 21 N. Y. Supp. 960, a will was denied probate where the testator entertained certain beliefs as to his wife, which beliefs were not based upon facts, the conclusion being that he had delusions affecting the will.

The same rule was laid down in Re Loewenstine's Will, 2 Misc. Rep. 323, 21 N. Y. Supp. 931. In Re Dorman, 5 Dem. Sur. 112, probate was refused where the testator acted under the delusion that his children were his enemies, conspiring to rob him of his property. The cases of In re Lockwood's Will, 8 N. Y. Supp. 345, and In re Kahn, 5 N. Y. Supp. 556, probate in either case was denied upon the theory that the testator had delusions that his family and relatives were trying to poison him.

Attention has been called to several cases where wills have been sustained, the testator believing in supernatural objects, ghosts, witches, and things of kindred nature; but in those cases there was nothing affecting the testamentary disposition,—nothing controlling at the time of the execution of the will. The family of his deceased son were objects of the bounty of the decedent; they were dependent to a great degree upon him; and the fact that the daughter-in-law is not a blood relative cannot be weighed heavily against such a proposition, in the light of the whole evidence. The circumstances and conditions which surrounded them long before the death of Jerome were known to the decedent. He had provided for said family by a previously declared testamentary intent. He had delivered to Nathaniel property amounting to upward of $10,000; to Jerome's family he had bequeathed and devised property amounting to about $5,700. The will in question takes therefrom about $4,000, gives it to the son of Nathaniel, and leaves for each of the children of Jerome the sum of about $800. Nathaniel had come from his home in the West, and was at the house of Brennan, when the will was executed, and from the evidence was unmistakably officious in the details leading to the execution of said instrument. The unfortunate accident to said son of Nathaniel, resulting in the loss of an arm, which is urged as a reason for the change of testamentary intent, is not sufficient to overcome all the other proofs as to the delusions of the testator. The evidence is conclusive that the delusions above referred to entered into and became a controlling factor in the will offered for probate. If said instrument were executed during a lucid interval, free from the delusions herein referred to, it is a valid instrument; but, if so, it must depend in a great measure upon the testimony of the subscribing witnesses. Their evidence has been carefully examined, and to sustain this instrument upon their evidence, weighed in connection with the entire facts in the case in reference to his mental condition, is unwarranted. There was no restoration of the normal condition of his mind such as to enable him to judge of the testamentary act, or to give expression to his testamentary intent. The foregoing views lead to the conviction that the testator, at the time of the execution of the instrument offered for probate, did not possess testamentary capacity. A decree denying probate should, therefore, be entered. Probate denied.